20-1961. Mr. Fenster, please begin when you're ready. And just for myself, I would ask you to not repeat everything that you said on the large overlapping issue between the two. If you have something new to add, that would be welcome. Thank you, Your Honor. And may it please the Court. So, the Court should reverse the PTAB because substantial evidence does not support the Board's findings. The big argument, Your Honor, is that Ogino does not disclose the embodiment expressly with TTL because it does not tell where to place the sensor. And what I'd like to focus Your Honor on in light of your admonition is specifically the only teaching in Ogino about removing an embodiment that removes the cover glass is at the bottom of Column 5, carry over to Column 6. And specifically, what it says is that an effect similar to the optical member cover glass may be given to the fifth lens or the like by applying a coating or the like without using. Nothing in that sentence tells you where to move it. It just says that... Counsel, this is Judge Stoll. I understood that you were going to really focus on Ogino in view of feicht. Am I saying that correctly in this appeal since you've already argued the other issues? Okay. I will turn there, Your Honor. I appreciate that. Ogino, the point, just to finish that point, is Table 11 does not disclose the embodiment that has a coating applied to L5 or the like. It doesn't tell you where to place the sensor. It doesn't actually lay out what you would do if you were to remove the cover glass. And therefore, there is no express disclosure. Okay. Turning now to bike. So, this, again, is really just quintessential hindsight. So, the bike is a reference that has to do with the manufacturability. And it describes what it calls rules of thumb. But in our reply, we show that bike actually describes those as the limits of manufacturability. And there are multiple rules there that apply to all of the lens elements. And it is undisputed that multiple of those lens elements do not meet multiple of those rules in Ogino. And so, what would motivate the person of ordinary skill in the art to change only the center-to-edge thickness ratio for L1 out of all of the lenses when other lenses are much further out of whack relative to the limits of manufacturability disclosed in bike? And, counsel, do I remember correctly that bike, I mean, I appreciate what you're saying, but doesn't bike also say that, you know, you don't have to use all of these rules of thumb, you could just use some, and that these are rules of thumb? So, doesn't that, isn't that something that supports, provides some evidence to support the board's determination here? No, not in advance. So, it doesn't point one of skill in the art to say let's, you know, to motivate one of skill in the art to change L1. The board specifically found that Ogino does disclose a center-to-edge ratio down to 3.1, but not 3.0. It specifically found that with respect to Ogino. So, what about bike by itself or Ogino by itself would cause one of skill in the art to make that particular modification if they didn't have the roadmap of meeting the claims of the 568 patent? And, your honor, there is nothing. And to the contrary, it's undisputed that the record evidence is that other lenses are much further by multiples out of whack relative to the manufacturability of the manufacturability guidelines or rules of thumb in bike. So, if one of skill in the art were motivated to improve the manufacturability, which would be a motivation, they would start with the things that are sort of most wrong. Here, they start with the thing that is least wrong on the least lens, and I'm not sure that's really the least, but it's a small issue relative to the others, and picks out one lens out of four that are out of bounds with that, that don't meet that, and makes that one change. The reason they only make... This is Judge Stoll again. It just feels like such a quintessential factual issue to me. I just want to make sure you have a chance to address my question. So, I want to tell you what I'm thinking, that it's a quintessential factual issue. We've got bike. It's a 2010 article, and it says, here's some things that you can do to improve manufacturability, and one of them is this thing that you assert is so critical, right? And so, I'm just having a hard time. We've got an expert testimony. We've got a teaching of all the limitations of the claim. I'm just having a hard time understanding why, you know, with the rule of thumb being, here are some things you can try, why this wouldn't be sufficient under KSR. Yeah. Your Honor, I absolutely get that this is a fact issue, and it is a tough burden for us for substantial evidence, but my point is that what bike does is, at best, it says, here's a bunch of guidelines that apply to all of the lenses, but there's many, many dozens of combinations of things that could change, and there's nothing that the board points to, or that, frankly, is in the record to say, change this one parameter of L1 only, and leave everything else the same because you have to in order to meet the claim elements. So, while it's one of many things that could be tried, and I agree that it's, you know, an obvious to try, but it's not an obvious to try like in the pharmaceutical context where you have a very discrete number of things to try. Here, there are dozens, and so that's the real crux of the issue, and even though I have, I acknowledge the very high burden, and that this is a fact issue, this is post hoc rationalization because unless you have the claim telling you make the ratio for L1, 3, try that and see if it works, and then look to bike, there's nothing that would point you in that direction, and we also pointed to the handbook of optics that the board did rely on in modifying Ogino with respect to claims 1 through 4 and showed how making this one change would be counter to the teachings in the handbook of optics. So, there are counter, not only is there no roadmap pointing one of skill in the art a priori, motivating them to make this change as opposed to any of the other dozens of changes, but there's also countervailing evidence as well that was not considered by the board, and that's why it's not supportive. Can I ask you something? You keep on referring to dozens of changes, but there's 13 rules of thumb, right? You're just saying you're multiplying it and making it bigger by saying that you could pick different ones of these in combination. Do I understand that correctly? Is that why you're referring to dozens? Well, okay, so there are 13 rules of thumb, each of which applies to each of five lenses, okay? So, for example, the rule that they focus on with the ratio centered to distance, that has to apply according to bike to L1, L2, all the way through L5. Similarly, the rule just above that, the diameter to edge, also has to apply to each of those, and that's true of each of the rules. So each of the rules to each of the lenses, the combinations of all of those really is in the dozens, but there's nothing pointing one of skill to just take this one rule to this one lens element and only make that change. If they were to make changes to all of them, it would no longer meet the claim element. That's not their obviousness combination. They're saying it would be obvious to change only L1. Thank you. Mr. Fenster, can I ask you a question that I probably should have figured out the answer to, but I'm confused? What's the diameter of a lens? Not of the aperture, not the radius of curvature, but what's the diameter of the lens, which plays some role in the board's analysis and I think in maybe your papers? Yeah, it does. My understanding, Your Honor, is that it's the distance across the lens. So you take the two furthest points and measure a straight line between them. That gives you the diameter of the lens, is my understanding. That's different from the center thickness? Yes, the center thickness is the thickness. So if you recall back to the distance – so if you look at a Gino, for example, the thickness D1 is shown as – that's actually – so we're looking at the lens in cross-section. Yeah. Okay, so that's from the front to the back. That's the thickness. And that is the thickness at the center compared to the thickness at the edge that we're comparing for that ratio. The diameter is looking at the same cross-section, sort of the distance from the top to the bottom. Ah, okay. That's my understanding. Okay, thank you. I don't – did your beep go off or not? It did not yet, but I think I'm just about done. So there really – unless you have any other questions, we don't think that there's anything in BIC that would point one of Skilny Art to make this change and only this change. And it's important to focus on the fact that it's only this change. If you applied that rule to all of the lenses, which they haven't done in their petition, it would no longer meet the claim elements. And so, you know, really what they have to show is that one of Skilny Art would be motivated to make that change only to that lens and none of the others. And you can't rationalize that without hindsight. Good timing. We should hear from Ms. Oliver now. Thank you, Your Honor. And may it please the Court. Again, this is Angela Oliver on behalf of AAPL. The Court should affirm the Board's decision here because, again, the appeal is not eligible for an Arthrex remand and the Board's findings are supported by substantial evidence. Both issues before the Court in this appeal are substantial evidence issues, the TTL issue as well as the combination of OGINO and BIC. I'd like to make one brief point with respect to the TTL issue. On Appendix Page 27 of the Board's opinion, the Board explains that the sensor moves. And the Board explains precisely how much it moved. It moved by 0.102 millimeters closer to the object-side surface of the first lens element. That is the difference between the 4.489-millimeter value that Corporatronics argues is the TTL and the 4.387-millimeter value that AAPL argues is the TTL. The difference, of course, in those two values being the difference between whether or not you include the cover glass. And the Board cited the expert testimony of Corporatronics experts on Appendix Page 3226 to support this overall conclusion that the sensor does indeed move. On Appendix Page 3226, Dr. Moore explains that this is with respect to the 032 patent, but the analogy is the same with respect to the patent at issue here. Dr. Moore explains that when you remove the cover glass, the plane 114, where the sensor is located, what page are you? I'm sorry, Your Honor. It's Appendix Page 3226. Thank you. And this is transcript page on A3226. Oh, I'm sorry. It's page 72 of that, beginning at lines 14 through 22. The Board cited this range for this point. And here, Dr. Moore explains that with respect to measuring the TTL value, when you remove the cover glass, the plane 114, which is where the sensor is, shifts to the left. That's exactly consistent with the calculations that we've been discussing today, that these are just simple links. And so when you replace the cover glass with the length that you would need to replace it with air, that's what happens, the links between these changes. Is the specific, what is it, 0.10 something figure in this opinion of the Board, does that appear in the earlier cases opinion, the 1424 opinion of the Board? I do not believe the 0.102 millimeter, that subtraction is mentioned in the other Board opinion. However, it's facially apparent from the Board's analysis in that opinion, because the Board explains that it moves based on the difference of 4.489, which is with the cover glass, and 4.387, which is without the cover glass. So again, the calculations here that are done in both places and explained in detail by the Board in both cases show exactly how much this moves. In any event, Your Honor, if the Court were to affirm the finding in this appeal, in the 1961 appeal on this issue, it would have preclusive effects with respect to the same finding in other appeals, including the other ones today. But I don't think the Court needs to reach that, because there is sufficient explanation, detailed calculations from the Board in both appeals. But I did want to point the Court to this particular expert testimony that kind of ties all of this together. Okay. What about the combination with BIC? Yes, Your Honor. So again, as Judge Stoll emphasized, this is a substantial evidence issue. The key emphasis here is that BIC is a set of rules of thumb. These are various design considerations. The Board recognized that they described different cost tradeoffs between these considerations. And so these are things that a prosecutor would have considered and used in their overall analysis as to what priorities they had as they designed each particular lens. Now, these are done on a lens-by-lens basis. And importantly, the only lens that is being modified in this proposed combination is Lens 1. And actually, Lens 1 does satisfy both rules of thumb that the parties have been discussing in this case. Corporatonic's only argument is with respect to other lenses that are not being modified. And this Court's case law is clear. There's no need to go redo a motivation-to-combine analysis for elements that are already combined in a prior art reference. I believe the General Electric versus Raytheon Technologies case is helpful for that. When you're considering the invention as a whole, we don't have to reconduct a motivation-to-combine for those aspects. I'd also, with respect to the argument that this is just motivated hindsight reasoning, I'd like to point out that this is precisely consistent with what, beyond bike, what a prosecutor would have understood at the time. So, if you'll bear with me, just to trace through some of the Board's reasoning. The Board cites pages 74 and 75 of Dr. Satyan's declaration, which is where he analyzes Claim 5 by referring back to the similar limitation 1.8. And specifically, the helpful citation for the Court here, I believe is Appendix 615 through 617. And I'll turn to that just briefly. So, here, this is a lengthy section in which Dr. Satyan explains precisely, mathematically, why this ratio makes sense and how it would work. On pages 615 and 616, he's discussing the bike reference and this particular ratio. And he also points out that, at 616, he cites the Handbook of Optics. So, an additional piece of art that a prosecutor would have been aware of that further supports his testimony here. And it explained that it is good policy to avoid element forms where this ratio, the center-to-edge thickness ratio, exceeds 3 for positive elements. So, of course, that does not teach this limitation, and that's not how this testimony was used, or this evidence was used. But it supports the fact that this ratio of 3 is not completely out of the blue. This was a well-known ratio related to manufacturing considerations. And so, it's not looking back and picking and choosing what a prosecutor would have done based on these claims. This particular ratio in the area of 3 was well-known. And that's supported by the substantial evidence. At the end of the day, Your Honor, bike is a set of rules of thumb. And a posita is an individual of ordinary creativity who would understand that you would use some of those rules of thumb in some cases, and you wouldn't use them in other cases. If the court will indulge an analogy, I believe this is helpful. For example, the recent redesign of the Ford F-150 truck. The court used aluminum to increase fuel efficiency to make the truck much lighter. But the designers chose to not prioritize fuel efficiency in other aspects of the truck. So, for example, it's a very tall and boxy body design, which distinctly decreases fuel efficiency because of wind resistance. But that was chosen based on customer preferences. And so, it is not inconsistent to say, in some instances, a posita would have prioritized one goal, a manufacturing goal, and in other instances would have prioritized other design goals with respect to the overall functionality of the lens. In short, the board's motivation to combine analysis here is based on a specific goal that a posita would have been aware of and would have prioritized in some circumstances. That finding is supported by substantial evidence, and it's sufficient to show that claim five would have been obvious. So, unless there are further questions on either of the issues, we respectfully would ask the court to affirm. Hearing no questions, thank you. And Mr. Fenster, we'll hear from you for your rebuttal. Thank you, Your Honors. If I can just respond quickly to Ms. Oliver's comments regarding anticipation. So, first, the portion that she cited at Appendix 27, where the board said it would move the difference between that the image plane moves 0.102 closer, there's nothing cited for that, and there's no support for that. Nothing in the record, as we've seen, says that the sensor is moved. And the portion that Ms. Oliver cited to at 3226 for Dr. Moore's deposition at page 72, lines 14 through 22, that doesn't say it either. What it says is that if the cover glass were removed, it would shift to the left, but it doesn't say to where. Nothing says to where. And because there's no disclosure and no support for the board's finding as to where the sensor would be moved, if the cover glass were removed and if there were a coating, which is not disclosed in the table, that's why the board's finding lacks substantial evidence. With respect to the combination with bike, again, while all of the evidence that Ms. Oliver pointed to points to an obvious to try and basically saying that one of skill in the art might be motivated to make any one of these various potential combinations, but without making any specific motivation. To make the specific change to the thickness ratio for L1 and that lens only. And that really is the critical failure for motivation to combine. The board just has no substantial evidence, nothing to support the board's finding, that one would make that change and only that change. And that's really what they need to do to show in order to meet their burden. Unless the panel has any further questions, we thank you for all of your consideration on all of these appeals. Thank you, Mr. Penster, and the case is submitted.